2026 IL App (1st) 241068-U

FIFTH DIVISION
August 14, 2026

No. 1-24-1068

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 2013 CR 0580501 |
| | ) | |
| D'ANDRE FULLER, | ) | Honorable |
| | ) | James Bryan Novy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE WILSON delivered the judgment of the court.
Justices Mikva and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's order summarily dismissing defendant's postconviction petition is reversed where defendant stated the gist of a constitutional claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

¶ 2    Defendant D'Andre Fuller appeals the first stage dismissal of his *pro se* postconviction petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), arguing that the trial court erred in summarily dismissing his petition because he raised the gist of meritorious claims. Specifically, Fuller contends that his petition set forth arguable claims that (1) the State violated *Brady* (373 U.S. 83 (1963)) by failing to disclose a witness statement,

(2) the State knowingly used false testimony to obtain an indictment, (3) trial counsel was ineffective in failing to file a motion to quash arrest and suppress evidence, and (4) appellate counsel was ineffective when counsel made an argument based on an incorrect statute. We address only the *Brady* claim. For the following reasons, we agree with Fuller that the circuit court erred by dismissing his postconviction petition at the first stage because he stated the gist of a constitutional claim that the State committed a *Brady* violation. We reverse and remand for second stage proceedings.

¶ 3                                    I. BACKGROUND

¶ 4     The following facts are taken from our order affirming Fuller's conviction on direct appeal. *People v. Fuller*, 2022 IL App (1st) 172483-U. We recite only the facts necessary to the disposition of this appeal.

¶ 5     Fuller was charged with the first degree murder of Tyrone Scott, and a jury trial commenced on May 18, 2015.

¶ 6     At trial, Timothy Lewis testified that he knew Fuller from the neighborhood as "Pookie." Lewis had been a community representative at the grammar school that Fuller attended. In addition, Lewis was a very good friend of Scott's, whom he knew from the neighborhood.

¶ 7     On November 26, 2012, Lewis was on the corner of South Kildare Avenue and West Van Buren Street in Chicago doing security for drug sales. On direct examination, Lewis stated that Scott, Taurean Holmes, and Marcus Harrington were on the corner with him. On cross-examination, Lewis stated that Miguel Gore was also there.

¶ 8     Lewis walked three blocks away to a nearby Blue Line train stop to drum up business for the drug sales. As Lewis walked back to the corner of Kildare and Van Buren, he saw Fuller walking 15 feet away. Lewis said, "What's up, Pook," but Fuller just looked at him and kept

walking. Fuller was wearing jeans and a black hoodie tied around his face. Lewis could clearly see Fuller's face, and noticed Fuller's limp. Lewis lost sight of Fuller as the two walked in opposite directions.

¶ 9   Five minutes later, as Lewis neared the corner of Kildare and Van Buren, he saw Fuller standing in front of Scott. Scott was standing on the corner of a vacant lot; Lewis was at the south end of that lot and could see across. Lewis was one or two vacant lots away. It was evening, and Lewis could see by the light of the streetlights. Lewis heard Fuller shoot Scott once, then observed Fuller shoot two more times before Lewis ran away. Lewis heard two more shots as he ran. Lewis had testified before the grand jury that he observed all the shots.

¶ 10   On December 11, 2012, Lewis was arrested on an unrelated charge and asked to speak to police about the Scott shooting. On December 12, 2012, Lewis discussed the shooting with police and identified Fuller as the shooter in a photo-array lineup.

¶ 11   Lewis had nine drug-related felony convictions and a misdemeanor conviction for retail theft. At the time of Fuller's trial, Lewis was awaiting trial on a charge of possession of a controlled substance, but he had not been offered a deal in that case in exchange for his testimony in this case. Lewis served in the Navy for four months. He had previously testified falsely before the grand jury that he served in the Navy for four years and was stationed in the Philippines, San Diego, and Pearl Harbor. Lewis had previously told defense counsel that he worked at Fuller's school as a substitute teacher, not a school community representative.

¶ 12   Lewis was an active drug user at the time of the shooting, but he testified that he was not under the influence of drugs on the day of the shooting or at any point when speaking to police or testifying before the grand jury. A stipulation was later entered as to the testimony of Leanne Tyler, a substance abuse counselor who evaluated Lewis pursuant to a court order in an unrelated felony

drug case. On June 27, 2015, about a month after trial began, Lewis reported to Tyler that he was a daily user of cocaine. Lewis also reported that he had used a bag of heroin daily until around the time of the shooting, when he increased his use from three to four bags of heroin per day.

¶ 13    The next witness, Marcus Harrington testified that he was in custody for failing to appear in this case and had absconded from parole in an unrelated case. Harrington knew Scott from the neighborhood and Fuller from grammar school. Harrington knew Fuller by the nicknames of "Pookie" and "Ray Ray."

¶ 14    On November 26, 2012, Harrington was on the corner of Kildare and Van Buren with Scott and Gore selling heroin. Lewis was not working with them that day. Lewis had bought heroin earlier and left. Harrington was watching his girlfriend's car exit a nearby alley when he heard a shot from his left side. He saw Scott falling forward and Harrington ran away. Harrington heard two or three more shots as he was running.

¶ 15    On December 1, 2012, Harrington met with police officers investigating the shooting. Harrington testified that he told police he never observed the shooter. Police showed Harrington a photo-array lineup and told him to identify anyone that he knew. Harrington identified Fuller as someone he knew, not as the shooter.

¶ 16    Harrington met with police and an Assistant State's Attorney (ASA) on February 25, 2013. Harrington testified that he met with an ASA and gave a video-recorded statement. The State introduced the statement, in which Harrington said that on the evening of November 26, 2012, he was on the corner of Kildare and Van Buren with Scott and Gore selling heroin. Harrington was watching his girlfriend when he heard a gunshot, looked, and saw Scott falling forward. Scott was shot five or six times in all. The gunman was wearing a black hoodie and brown pants. The gunman was Black and carried a black handgun. Over defense counsel's objection, the State introduced

that part of Harrington's statement identifying Fuller as the shooter. Harrington was able to identify Fuller because he could see part of Fuller's face.

¶ 17    Harrington was next asked about his grand jury testimony. The State introduced portions of Harrington's March 15, 2013, grand jury testimony. Harrington told the grand jury that on the evening of November 26, 2012, he was on the corner of Kildare and Van Buren with Scott and Gore selling heroin. Harrington was watching his girlfriend when he heard a gunshot, looked, and saw Scott falling forward. He saw Scott get shot from behind four or five more times. The gunman was wearing a black hoodie and brown pants and carried a black handgun. The gunman was African American. It was about to get dark, and Harrington was able to see the shooter's face by the light of the streetlights. He again identified Fuller as the gunman.

¶ 18    At no point on direct examination did the State ask Harrington whether, independent of what he told the ASA and grand jury, he saw the shooter.

¶ 19    On cross-examination, Harrington testified that he did not know who the shooter was and that he lied to police, the ASA, and the grand jury about seeing the shooter. The streetlights had not come on yet at the time of the shooting. Harrington was high on ecstasy, marijuana, and alcohol that day. After the first shot was fired, Harrington turned toward the direction of the gunman, where he saw a man with a hood tied over his face. He saw a portion of the shooter's face from his mouth to the top of his eyes, but the shooter was not Fuller.

¶ 20    The next witness, Frank Kawczyk testified that he is a firefighter and paramedic. Kawczyk and three of his partners responded to the scene at 5:08 p.m. and he saw a man lying on the ground. He rolled the man over to put electrodes on him and check his vital signs, but the man was already dead.

¶ 21    Another witness, Terrence McKitterick, an evidence technician, responded to the scene at

around 5:30 p.m. McKitterick took photographs and video of the scene. He also recovered a bullet from the ground underneath Scott's body. McKitterick then went to the medical examiner's office to photograph and fingerprint Scott.

¶ 22    The parties stipulated to the medical examiner's report, which stated that Scott died of multiple gunshot wounds. Five bullets entered Scott's body through his right back, right posterior shoulder, right posterior thigh, left posterior forearm, and left chest. The parties also stipulated that the bullet found in Scott's brain and the bullet found on the ground beneath Scott's body were fired from the same gun.

¶ 23    The next witness, Detective John Hillman testified that he interviewed Harrington on December 1, 2012. Harrington did not appear to be under the influence of drugs or alcohol. Hillman testified that Harrington said he observed Fuller shoot Scott, and watched Scott fall to the ground as Fuller continued to fire his gun. Hillman presented Harrington with a photo-array lineup, and Harrington identified Fuller as the person who shot Scott.

¶ 24    On December 12, 2012, Hillman interviewed Lewis. Lewis had contacted police to discuss the shooting after being released on bond for an unrelated arrest. Hillman showed Lewis a photo-array lineup. Lewis identified Fuller as a person he saw approaching the scene where Scott was killed.

¶ 25    After Fuller was arrested, Hillman re-interviewed Harrington on February 25, 2013. Harrington did not appear to be under the influence of drugs or alcohol. An ASA also met with Harrington that day. Harrington then agreed to record a video statement. Harrington's video statement was published to the jury.

¶ 26    A stipulation was entered that Lewis had 11 prior convictions and Harrington had two prior convictions.

¶ 27    The jury found Fuller guilty of first degree murder. Defense counsel filed a motion for a new trial. Fuller raised a *pro se* claim of ineffective assistance of counsel, and the trial court ordered that a *Krankel* hearing be held. See *People v. Krankel*, 102 Ill. 2d 181 (1984). Fuller obtained private counsel, and an evidentiary hearing was held. The trial court denied the posttrial motion, finding that defense counsel was not ineffective where her decision not to call a witness was strategic and Fuller's alibi witness was not credible.

¶ 28    Fuller was sentenced to 60 years' imprisonment. In his direct appeal, Fuller argued that his trial counsel was ineffective. *Fuller*, 2022 IL App (1st) 172483-U, ¶¶ 28-40. Fuller also argued that the circuit court erred when it failed to question the jury using the instructions required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). *Id.* ¶¶ 42-49.

¶ 29    On November 23, 2022, this court affirmed Fuller's convictions, finding that trial counsel was not ineffective for failing to object to the admission of witness's prior statements of identification and the trial court's error in failing to question the jury in accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) did not prejudice defendant because the evidence presented at trial was not closely balanced. *Id.* ¶ 1. On March 29, 2023, the Illinois Supreme Court denied Fuller leave to appeal.

¶ 30    On December 7, 2023, Fuller filed a *pro se* postconviction petition in which he alleged the Cook County State's Attorney's Office withheld favorable evidence denying him a fair trial and violating due process. Specifically, Fuller alleged that the State committed a *Brady* violation by failing to disclose a December 12, 2012, police report documenting Detective Hillman's witness interview with Lewis. Fuller also alleged that the State knowingly used false testimony to obtain an indictment in violation of due process, trial counsel was ineffective in failing to file a motion to quash arrest and suppress evidence, and appellate counsel was ineffective when counsel argued

7

a statute that did not apply to the defendant.

¶ 31    On January 24, 2024, the trial court summarily dismissed Fuller's petition. The court concluded that the police report was neither exculpatory nor impeaching and stated that nothing in the police report exonerated Fuller. The court ruled that Fuller waived his claims that the State deliberately misled the grand jury and that trial counsel was ineffective because Fuller failed to raise either of those claims on direct appeal. Additionally, the court ruled that Fuller's claim of ineffective assistance of appellate counsel failed because appellate counsel relied on the correct statute throughout the appellate brief.

¶ 32    Fuller filed a motion for leave to file a late notice of appeal of the summary dismissal of his postconviction petition on May 14, 2024, which this court allowed on May 20, 2024.[1]

¶ 33                                   II. ANALYSIS

¶ 34    On appeal, Fuller argues that the circuit court erred in summarily dismissing his postconviction petition because he presented a non-frivolous claim of a constitutional violation. Specifically, Fuller contends that his petition sets forth arguable claims that (1) the State violated *Brady* (373 U.S. 83 (1963)) by failing to disclose a witness statement, (2) the State knowingly used false testimony to obtain an indictment, (3) trial counsel was ineffective in failing to file a motion to quash arrest and suppress evidence, and (4) appellate counsel was ineffective when counsel made an argument based on an incorrect statute. For the following reasons, we hold that the circuit court erred by dismissing Fuller's postconviction petition because he stated the gist of a constitutional claim that the State committed a *Brady* violation.

¶ 35                              A. Standard of Review

---

[1] Following the notice of appeal in May 2024, Fuller's counsel then filed seven motions for extension of time to file an appellant brief, which this court allowed. The State also requested two extensions to file an appellee brief. As a result, this case was not fully briefed until spring 2026.

8

¶ 36    The Act (725 ILCS 5/122-1 *et seq.* (West 2022)) allows a criminal defendant to challenge their conviction based on an alleged violation of federal or state constitutional rights. *People v. Jean*, 2024 IL App (1st) 220807, ¶ 28. The postconviction petition is not a substitute for an appeal from the conviction, but a collateral attack on the circuit court proceedings. *People v. Ealy*, 2024 IL App (1st) 221748, ¶ 30. A postconviction proceeding occurs in three stages. *People v. Huff*, 2024 IL 128492, ¶ 19. The circuit court here dismissed Fuller's petition at the first stage.

¶ 37    At the first stage, the court ascertains, without input from the State, whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022). A petition is frivolous if it has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A defendant need only present "the gist of a constitutional claim" with a limited amount of detail. *People v. Sparks*, 393 Ill. App. 3d 878, 883 (2009). The court must take as true a petition's allegations unless they are "positively rebutted" by the original trial record. *People v. Toy*, 2013 IL App (1st) 120580, ¶ 18. If the court determines that a petition is frivolous and patently without merit, it must dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2022).

¶ 38    Issues that were adjudicated on direct appeal are barred by the doctrine of *res judicata. People v. Pitsonbarger,* 205 Ill. 2d 444, 458 (2002). Issues that could have been raised earlier, but were not, are deemed forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005). We review the summary dismissal of a first stage postconviction petition *de novo. People v. Laney*, 2024 IL App (1st) 221129, ¶ 50.

¶ 39                                B. The Alleged *Brady* Violation

¶ 40    Fuller claims that the State violated *Brady* by withholding a December 12, 2012, police report. In *Brady*, the United States Supreme Court held that the prosecution has an affirmative duty to disclose certain favorable evidence to the defendant. 373 U.S. 83 (1963). A *Brady* violation is

9

the failure to disclose evidence that is material to the defendant's guilt or punishment and is a violation of the defendant's constitutional due process rights. *People v. Rapp*, 343 Ill. App. 3d 414, 417 (2003). In Illinois, the *Brady* rule has been codified in Supreme Court Rule 412(c) (eff. March 1, 2001). *Id*. at 418.

¶ 41   A successful *Brady* claim requires a defendant to show: (1) the withheld evidence was either exculpatory or impeaching; (2) the State either willfully or inadvertently suppressed the evidence; and (3) the evidence was material to guilt or punishment. *People v. Morales*, 2019 IL App (1st) 160225, ¶ 20. As previously discussed, a petitioner need not prove a *Brady* violation, but only state the "gist" of a claim. *Allen*, 2015 IL 113135, ¶ 24.

¶ 42   Fuller claims that he established the gist of a constitutional claim that the State violated *Brady* when the State withheld a December 12, 2012, police report during discovery that Fuller later obtained via the Illinois Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2022)). Fuller sent a FOIA request to the Chicago Police Department (CPD) and the Cook County State's Attorney's Office seeking all statements, police reports, and evidence in his case. In response to his FOIA request, CPD provided documents including a December 12, 2012, statement taken by Detective John Hillman from Timothy Lewis. Fuller alleges that the December 12, 2012, police report containing the statement was not included in the FOIA response provided by the State's Attorney's Office. Assuming the omission by the State's Attorney's Office was an error, Fuller repeated his FOIA requests and again only received the December 12, 2012, report from CPD.

¶ 43   Fuller argues that the withheld December 12, 2012, is exculpatory and impeaching. He asserts the police report "contradicts Lewis's ability to make an identification and is impeaching because Lewis describes the suspect as wearing clothing that obscured identification and says he

10

was positioned such that he could not actually see the shooting." Fuller also asserts that the report provides impeachment by omission of Lewis because it "omits key details that Lewis later testified to before the grand jury, such as interaction with the defendant, observation of a supposed limp, and witnessing the full sequence of shots—contradictions which support the impeachment value of the suppressed material."

¶ 44    The State counters that Fuller's petition "failed to allege that the report in question was withheld" by the State during pre-trial discovery. However, at this stage we assume, as the trial court did, that the police report was withheld.

¶ 45    In this case, the trial court erred by applying a standard that required more than the minimal threshold applicable at the first stage. The circuit court explained its reasoning as follows:

> "Petitioner fails to establish how the police report is exculpatory or impeaching. In the report, Lewis says that the person he saw wore a black hoodie, dark pants, and a dark colored bandanna, which Petitioner offers as proof that Lewis could not have identified him as the shooter. However, elsewhere in the police report, Lewis states that he did explicitly see Petitioner standing right behind the victim after the shooting. Petitioner's self-serving statement that Lewis could not have seen Petitioner has no basis in the police report, wherein Lewis specifically identifies Petitioner. Lewis continued to identify Petitioner as the shooter throughout the Chicago Police Department's ("CPD") investigation, including during a lineup conducted by the CPD on a later date. *Fuller*, 2022 IL App (1st) 172483-U, ¶ 22.
>
> Nothing in the police report exonerates or exculpates Petitioner from committing the murder in question. In fact, the police report does the exact

11

opposite: the CPD officer recorded Lewis specifically identifying Petitioner as the person standing right behind the victim immediately after the shooting. The police report specifically implicates Petitioner as the shooter, which Lewis would proceed to continue to do in a subsequent lineup and interview. Petitioner cannot claim that the State prejudiced him by not providing a report that heavily leans more to his guilt than to his innocence. Petitioner fails to establish a violation under *Brady*."

¶ 46    Although the trial court articulated the correct general standard for a *Brady* violation, its analysis applied a burden higher than permissible at the first stage. At the first stage, Fuller need not prove a *Brady* violation; he need only state the gist of a claim. *Sparks*, 393 Ill. App. 3d at 883. It is error for the court to consider a first-stage petition "on the merits." *People v. Reyes*, 369 Ill. App. 3d 1, 18 (2006). Rather, the court is to determine whether the petition alleges a constitutional claim which would require moving to the second stage under the Act. *Id.*

¶ 47    With this lighter, first stage burden in mind, we turn to the question of whether the alleged *Brady* violation is sufficient to constitute an alleged constitutional claim. In particular, we focus on whether the December 12, 2012, police report can arguably be considered favorable to Fuller because it is exculpatory or impeaching as is required to prevail in a *Brady* claim. *Banks*, 540 U.S. 668, 691 (2004). Here, the circuit court's analysis fails to consider the possible impeachment value of the report.

¶ 48    Although the report is not exculpatory, it arguably could still be impeaching because it omits several details Lewis later provided. Impeachment evidence qualifies as "favorable" under Brady. *Banks*, 540 U.S. 668, 691 (2004). In determining that the police report has arguable impeachment value, we emphasize that at the first stage the court is not permitted to make credibility determinations. *Toy*, 2013 IL App (1st) 120580, ¶ 18. Here, the report could arguably

be used for impeachment because it omits certain details that Lewis later testified to before the grand jury, such as observing the shooter's limp and witnessing the full sequence of gun shots. Impeachment by omission is a recognized form of impeaching evidence that could arguably be used to discredit Lewis. See *People v. McWhite*, 399 Ill. App. 3d 637, 642 (2010) (discussing impeachment by omission where the witness had the opportunity to make a statement about the omitted facts and a reasonable person would have included the omitted facts).

¶ 49    By weighing Lewis's credibility and concluding the report "leans more to his guilt than to his innocence" the circuit court made a decision on the merits that is not permitted at the first stage. Our role at this stage is only to determine whether Fuller alleged an arguable constitutional claim, not whether he will ultimately prove it. We make no finding as to whether the arguable impeachment value of this report rises to the level of a *Brady* violation. That is a question on the merits for the second stage or third stage.

¶ 50    Accordingly, we agree with Fuller that the circuit court erred by dismissing his postconviction petition because he stated the gist of a constitutional claim that the State committed a *Brady* violation. We therefore remand the case for second stage proceedings. Because the petition must proceed to second stage review if *any* claim is non-frivolous, and Fuller's *Brady* claim meets that threshold, we need not assess the remaining claims. See *People v. Rivera*, 198 Ill. 2d 364, 371 (2001) (holding the Post-Conviction Hearing Act does not provide for the dismissal of individual claims and required the entire petition to be docketed if it is not frivolous or patently without merit). We express no opinion as to whether Fuller's allegations will support a substantial showing of a constitutional violation, as is required at the second stage.

¶ 51                                    III. CONCLUSION

¶ 52    Based on the foregoing reasons, we reverse the summary dismissal of defendant's

13

postconviction petition and remand for second stage proceedings.

¶ 53    Reversed and remanded.